**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| Reid Gritsavage, as the Representative of a Class of Similarly Situated Persons, and on Behalf of the Auto-Owners Insurance Company Retirement Savings Plan,<br><br>Plaintiff,<br><br>v.<br><br>Auto-Owners Insurance Company and the Administrative Committee of the Auto-Owners Insurance Company Retirement Savings Plan,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      Plaintiff Reid Gritsavage, individually and as representative of the Class described herein, and on behalf of the Auto-Owners Insurance Company Retirement Savings Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Auto-Owners Insurance Company and the Administrative Committee of the Auto-Owners Insurance Company Retirement Savings Plan (the "Committee") (collectively, "Defendants"). Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan, its participants, and its beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief.

### **INTRODUCTION**

2.      As of the first quarter of 2025, Americans had approximately $12.2 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Since the passage of Section 401(k) of the Internal Revenue Code in 1978, only 10% of private-sector, non-union workers have access to pension plans,[2] meaning 401(k) type plans have replaced pensions to become the most common retirement program for American workers.[3]

3.      As access to pension plans has dwindled, concerns surrounding retirement readiness continue to grow. The National Institute on Retirement Security found that 79% of Americans believe there is a national retirement crisis, while 73% stated that inflation has them more concerned about retirement.[4] With 401(k) plans serving as the predominant retirement savings vehicle for American workers, their prudent and loyal management is crucial to resolving these issues.

4.      A critical component to adequately saving for retirement is ensuring that assets are invested in a manner that provides an opportunity to achieve sufficient returns to grow an asset

---

[1] *See* Investment Company Institute, *Retirement Assets Total $43.4 Trillion in First Quarter 2025* (June 18, 2025), *available at* https://www.ici.org/statistical-report/ret_25_q1 (last visited Aug. 5, 2025).

[2] *See* Bureau of Labor Statistics, U.S. Dep't of Labor, *News Release: Employee Benefits in the United States – March 2023* 1 (for release Sept. 21, 2023), *available at* https://www.bls.gov/news.release/archives/ebs2_09212023.pdf (last visited Aug. 5, 2025).

[3] *See* James McWhinney, Investopedia, *The Demise of the Defined-Benefit Plan and What Replaced It* (updated May 12, 2024), *available at* https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp (last visited Aug. 5, 2025); Juhohn Lee, *How 401(k) Accounts Killed Pensions to Become One of the Most Popular Retirement Plans for U.S. Workers*, CNBC, updated Apr. 28, 2022, *available at* https://www.cnbc.com/2021/03/24/how-401k-brought-about-the-death-of-pensions.html (last visited Aug. 5, 2025).

[4] Dan Doonan & Kelly Kenneally, Nat'l Inst. on Ret. Sec., *Retirement Insecurity 2024: Americans' Views of Retirement* 1 (Feb. 2024), *available at* https://www.nirsonline.org/wp-content/uploads/2024/02/FINAL-2024-Public-Opinion-Research.pdf (last visited Aug. 5, 2025).

base while outpacing inflation. If an investor is invested too conservatively for too long, they will be unable to make up the foregone returns earned by more risk-appropriate investments. It is therefore crucial that participants in a 401(k) plan are adequately informed and educated not only about the risks of investing too aggressively for a given risk tolerance, but also the perils of maintaining an asset allocation that is too conservative to provide any chance of meaningful retirement savings.

5.    To safeguard retirement plan participants and ensure appropriate investment, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003) (quotation marks omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), and "with the care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.    Importantly, participants in a 401(k) plan should aim "to achieve a portfolio with aggregate risk and return characteristics at any point *within the range normally appropriate for the participant or beneficiary*[.]" 29 C.F.R. § 2550.404c-1(b)(3)(i)(B)(3) (emphasis added). In practice, most participants do not possess the requisite knowledge or confidence to properly construct a portfolio that appropriately balances risk with return. In a 2023 401(k) Participant Study conducted by Charles Schwab, only 27% of respondents felt "[v]ery confident in [making] investment decisions on [their] own[.]"[5]

---

[5] Charles Schwab, *2023 401(k) Participant Study* 10 (Aug. 2023), *available at* https://content.schwab.com/web/retail/public/about-schwab/schwab_2023_401k_participant_survey_findings.pdf (last visited Aug. 5, 2025).

7.    This lack of understanding predictably results in investment allocations that are out-of-step with an individual's respective risk tolerance. One study found it is not unusual for two-thirds of plan participants to be misallocated.[6]

8.    These improper participant asset allocations are exacerbated by investor inertia. In the context of investing, inertia is the concept that individuals are prone to the status quo, leaving their investment elections static over years and often from enrollment. The seminal study on investor inertia found that over 75% of participants remain in the default investment option after enrollment.[7] Similarly, JPMorgan observed that plans that add target date funds as a new option to their investment lineups without mapping or reenrolling participants see an adoption rate of less than 5%, even a few years later.[8] In short, investors opt for inaction unless prodded.

9.    While investor inertia may benefit participants if their default option suitably balances risk and return, such as in a target date or balanced fund, maintaining most or all of one's retirement savings in a low-yielding option, such as a money market or stable value fund, will leave an investor woefully unprepared for retirement. Yet that is exactly what has transpired in the Plan.

10.    Since 2019 the Plan has allocated, on average, approximately 33% of its assets, or roughly $223 million, to a proprietary stable value fund. This material allocation to a stable value

---

[6] Russell Investments, *DC Plan Re-Enrollment: A Fiduciary Imperative?* 3 (revised Oct. 2023), *available at* https://russellinvestments.com/-/media/files/us/insights/institutions/defined-contribution/dc-plan-re-enrollment-a-fiduciary-imperative.pdf (last visited Aug. 5, 2025).
[7] Brigitte C. Madrian & Dennis F. Shea, Working Paper No. 7682, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, Nat'l Bureau of Econ. Research Working Paper Series 3-4, 7, 18-20, 53 (May 2000), *available at* https://www.nber.org/system/files/working_papers/w7682/w7682.pdf (last visited Aug. 5, 2025).
[8] JPMorgan, *Understanding Re-Enrollment* 1 (2021), *available at* https://am.jpmorgan.com/content/dam/jpm-am-aem/global/en/insights/retirement-insights/ri-reenroll-0719.pdf (last visited Aug. 7, 2025).

4

fund is counter to prevailing investment theory, guidance from the Department of Labor, and the actions of similarly situated fiduciaries. By sitting idly as Plan assets continued to collect in the Plan's proprietary fund, Defendants have deprived the Plan's participants of millions of dollars in essential retirement savings while profiting from the significant amount of assets held within a proprietary investment fund.

11.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of their fiduciary duties (Count One). Plaintiff also asserts a claim against Defendant Auto-Owners Insurance Company for its failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

15.     Plaintiff Reid Gritsavage resides in St. Johns, Michigan. Plaintiff has been a participant in the Plan since before 2014, and consequently assets in his account have been invested in the Auto-Owners Life Insurance Company Deposit Administration Group Annuity Contract

since before 2014 and continuing to the present. Plaintiff has been financially injured by the unlawful conduct described herein. Plaintiff's account would be worth more today if Defendants had not violated ERISA as described herein.

**THE PLAN**

16.     The Plan was established by Auto-Owners Insurance Company on January 1, 2008.

17.     Effective December 31, 2010, the assets of the Auto-Owners Insurance Company Incentive Bonus Plan, a noncontributory defined contribution plan covering substantially all full-time salaried and hourly associates of Auto-Owners Insurance Company, were merged into the Plan.

18.     Effective December 31, 2010, the assets of the Auto-Owners Insurance Company Revised Thrift and Savings Plan, a voluntary savings plan covering eligible part-time and full-time associates of Auto-Owners Insurance Company prior to the formation of the Plan on January 1, 2008, were merged into the Plan.

19.     Prior to 2014, the only investment option available to participants within the Plan was the Auto-Owners Life Insurance Company Deposit Administration Group Annuity Contract. In 2014, Vanguard index funds and Vanguard target date funds were added as investment options to the Plan.

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34) covering all eligible part-time and full-time associates of Auto-Owners Insurance Company or a subsidiary or other closely affiliated company that has adopted the Plan, including Plaintiff. The Plan is a qualified plan under 26 U.S.C. § 401 and is of the type commonly referred to as a "401(k) plan."

21.     The Plan has held approximately $534.1 million to $864.3 million in assets and had approximately 6,950 to 8,950 participants with balances at any time during the relevant period.

22.     Participants may direct a portion of their earnings to their accounts in the Plan, and participants also may receive contributions from Auto-Owners Insurance Company as their employer. Participant contributions are held in trust.

23.     Participants in the Plan may direct the investment of their account assets from among the lineup of designated investment alternatives (i.e., investment options). Participants in the Plan are limited in their investment choices to the lineup of options offered by the Plan. Because the Committee determines the designated investment alternatives that are offered, the investment lineup maintained by the Committee is critical to participants' investment results and, ultimately, the retirement benefits they receive.

24.     The default investment for the Plan is a suite of Vanguard target date collective investment trusts.

#### DEFENDANTS

### *Auto-Owners Insurance Company*

25.     Defendant Auto-Owners Insurance Company is an insurance company headquartered in Lansing, Michigan. Auto-Owners Insurance Company is one of several companies within the Auto-Owners Insurance Group and is the Group's largest insurer.

26.     Auto-Owners Insurance Company is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and has the ultimate authority to control and manage the operation and administration of the Plan. Because Auto-Owners Insurance Company exercises discretionary authority, discretionary control, and discretionary responsibility with respect to the management and administration of the Plan and authority and control with respect to the management and

disposition of the Plan's assets, Auto-Owners Insurance Company is a fiduciary under 29 U.S.C §

1002(21)(A).

27.    Auto-Owners Insurance Company is also a fiduciary because it has authority to

appoint and remove members of the Committee. It is well accepted that the authority to appoint,

retain, and remove plan fiduciaries constitutes discretionary authority or discretionary control over

the management of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See*

29 C.F.R. § 2509.75-8 (D-4).

28.    The responsibility for appointing and removing members of such a committee

carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they

are complying with the terms of the Plan and ERISA's statutory mandates. 29 § 2509.75-8 (FR-

17). Furthermore, this monitoring duty carries with it a responsibility to "take appropriate

corrective action" if the appointed fiduciaries' conduct is deficient. Brief of Sec'y of Labor as

Amicus Curiae at 5, 8-9, *In re Williams Co. ERISA Litig.*, No. 02-153 (N.D. Okla. Aug. 22, 2003),

2003 WL 24063546.

***Administrative Committee of the Auto-Owners Insurance Company Retirement Savings Plan***

29.    Auto-Owners Insurance Company delegates a portion of its fiduciary

responsibilities for administering the Plan to the Administrative Committee of the Plan. Among

other things, the Committee is responsible for maintaining the Plan's investment lineup, including

monitoring the Plan's designated investment alternatives and making changes as appropriate. The

Committee is therefore a fiduciary pursuant to 29 U.S.C. § 1002(21)(A). According to the Plan's

Forms 5500, the Committee is also the "plan administrator" within the meaning of 29 C.F.R. §

2509.75-8 at D-3. Thus, the Committee is also a named fiduciary pursuant to 29 U.S.C. § 1102(a).

30.    Each Defendant identified above as a fiduciary to the Plan is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

31.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A)    for the exclusive purpose of:
>
>     (i)    providing benefits to participants and their beneficiaries; and
>
>     (ii)    defraying reasonable expenses of administering the plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

32.    These statutory parameters of loyalty and prudence impose a fiduciary standard that is considered "the highest known to the law." *Gregg*, 343 F.3d at 841 (quotation marks omitted).

## DUTY OF LOYALTY

33.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quotation marks omitted); *Gregg*, 343 F.3d at 840 (quotation marks omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)).

9

"Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

### DUTY OF PRUDENCE

34.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quotation marks omitted); *see Gregg*, 343 F.3d at 840. This includes "a continuing duty to monitor [plan] investments and remove imprudent ones[]" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Intern.*, 575 U.S. 523, 529 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation marks omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu" of investment options or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Pfeil v. State Street and Bank Trust Co.*, 671 F.3d 585, 597, 599-600 (6th Cir. 2012) (quotation marks omitted), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014)). It is no defense to the imprudence of some investments that others may have been prudent; a meaningful mix and range of investment options does not insulate plan fiduciaries from liability for breach of fiduciary duty. *See Hughes v. Northwestern University*, 595 U.S. 170, 175-77 (2022).

10

## DEFENDANTS' VIOLATIONS OF ERISA

**I.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

35.    As discussed below, Defendants sat idly as the Plan amassed a significant amount of its assets within its proprietary capital preservation option, the Auto-Owners Life Insurance Company Deposit Administration Group Annuity Contract the (the "Auto-Owners Stable Value Fund"). This proprietary Auto-Owners Stable Value Fund foreseeably does not allow for the possibility of amassing adequate retirement savings, yet Defendants focused on furthering their own business interests by allowing the Auto-Owners Stable Value Fund to serve as the single largest holding in the Plan.

**A.    Defendants Deliberately Allowed the Auto-Owners Stable Value Fund's Assets to Swell**

36.    Prior to 2014, the *only* investment option available to Plan participants was the proprietary, low-yielding Auto-Owners Stable Value Fund. That is, prior to 2014 all participants in the Plan, regardless of their age, risk tolerance, or need for investment options that provide the opportunity for capital appreciation, were limited to investing their retirement savings in a capital preservation option.

37.    The decision to limit participants to the Auto-Owners Stable Value Fund served only to benefit Defendants, as concentrating the Plan's assets in this proprietary investment product allowed Defendants to profit from Plan participants while participants' retirement savings sat idle. When additional investment options were added to the Plan in 2014, Defendants still prioritized their own business interests over those of the Plan's participants by maintaining the bulk of the Plan's assets within the proprietary Auto-Owners Stable Value Fund.

38.    Upon the introduction of Vanguard index funds and Vanguard target date funds to the Plan, Defendants opted to forego a re-enrollment process for participants. Re-enrollment is the

process by which a plan sponsor defaults participants' assets and future contributions into the plan's qualified default investment alternative. Re-enrollment can occur under numerous circumstances, but the primary goal is to reallocate participants' assets to a more appropriate asset allocation.

39.     The addition of Vanguard target date funds, which are eligible to serve as a plan's qualified default investment alternative, served as a clear opportunity to re-enroll participants away from the Auto-Owners Stable Value Fund into investments more aligned with participants' respective demographics. Furthermore, as of at least 2014 the Auto-Owners Stable Value Fund had exceeded the minimum termination years, meaning that it could have been terminated from the Plan without incurring any discontinuance or surrender charges. Yet by choosing to decline a re-enrollment process, Defendants deliberately maintained over $285 million—approximately 80% of the Plan's assets—in the proprietary capital preservation option. In the years that followed, Defendants never engaged in a re-enrollment process and the Auto-Owners Stable Value Fund continues to hold over $205 million of the Plan's assets.

40.     This outsized allocation to a stable value fund is completely out-of-step with other 401(k) plans. For example, in 2016 the Plan held over $267 million in the Auto-Owners Stable Value Fund, representing 67.9% of Plan assets. In contrast, in 2016 the average 401(k) plan allocated just 8.6% to capital preservation options like stable value and money market funds.[9] In 2020, the Auto-Owners Stable Value Fund still represented 37.3% of the Plan's total assets while the average 401(k) plan held just 7.5% of its assets in capital preservation options.[10]

---

[9] Sarah Holden et al., EBRI Issue Brief No. 594, *Changes in 401(k) Plan Asset Allocation Among Consistent Participants, 2016-2020* 4 (Oct. 25, 2023), *available at* https://www.ebri.org/docs/default-source/pbriefs/ebri_ib_594_k-long-25oct23.pdf (last visited Aug. 6, 2025).
[10] *Id.*

   B.    **The Auto-Owners Stable Value Fund Provides Participants Minimum Real Returns**

41.    The real-life harm of concentrating the Plan's assets within the Auto-Owners Stable Value Fund can be seen through a comparison of its returns to both inflation and other common balanced investments offered within 401(k) plans like the Plan.

42.    The interest credited to participants within the Auto-Owners Stable Value Fund is determined by Auto-Owners Life Insurance Company and is subject to a minimum crediting rate. The table below illustrates the amount of interest that the Auto-Owners Stable Value Fund has yielded for participants in comparison to the annualized rate of inflation.

| Year | Auto-Owners Stable Value Fund Crediting Rate | Inflation Rate |
|---|---|---|
| 2019 | 3.15% | 1.8% |
| 2020 | 3.05% | 1.2% |
| 2021 | 3.05% | 4.7% |
| 2022 | 3.15% | 8.0% |
| 2023 | 3.45% | 4.1% |
| 2024 | 3.55% | 2.9% |
| Annualized Average | 3.23% | 3.76% |

43.    As shown, investors within the Auto-Owners Stable Value Fund earned *negative* real returns over the relevant period.[11] In other words, Plan participants invested in the Auto-Owners Stable Value Fund *lost* money when accounting for inflation over this period. This is particularly startling in the context of a 401(k) plan, which is intended to allow employees to invest and grow their assets for retirement.

---

[11] The real rate of return is the annual percentage earned on an investment, adjusted for inflation. Marshall Hargrave, Investopedia, *The Real Rate of Return: Definition, How It's Used, and Example* (updated June 5, 2022) *available at* https://www.investopedia.com/terms/r/realrateofreturn.asp (last visited Aug. 6, 2025).

13

44.    It is for this reason that the Department of Labor specifically excluded capital preservation options like the Auto-Owners Stable Value Fund from its definition of a qualified default investment alternative. The Department reasoned that if it were to have included capital preservation options as qualified default investment alternatives, "stand-alone capital preservation products' generally inferior long-term investment returns would almost certainly erode the regulation's beneficial effect on retirement income."[12] Instead, "[t]he Department considered market trends, generally accepted investment theories, mainstream financial planning practices, and actual investor behavior, as well as the estimated effect of qualified default investment alternatives on retirement savings[]" in determining that "it is desirable to invest retirement savings in vehicles that provide for the possibility of capital appreciation in addition to capital preservation."[13]

45.    The harm to participants is further illustrated when assessing the returns that were foregone by Plan participants due to Defendants' decision to maintain the bulk of Plan assets in the proprietary Auto-Owners Stable Value Fund. Had Defendants prudently and loyally directed participant assets into the Vanguard target date suite that was added into the Plan, participants would have had the opportunity to valuably grow their retirement assets. The chart below shows the performance of each Vanguard target date vintage over the relevant period in comparison to the returns of the Auto-Owners Stable Value Fund.

---

[12] 72 Fed. Reg. No. 60477 (Oct. 24, 2007).
[13] *Id.*

14

| Investment | 2019-2024 Annualized Return |
|---|---|
| Vanguard Target Retirement Income Trust II | 5.16% |
| Vanguard Target Retirement 2020 Trust II | 6.84% |
| Vanguard Target Retirement 2025 Trust II | 7.95% |
| Vanguard Target Retirement 2030 Trust II | 8.81% |
| Vanguard Target Retirement 2035 Trust II | 9.68% |
| Vanguard Target Retirement 2040 Trust II | 10.52% |
| Vanguard Target Retirement 2045 Trust II | 11.32% |
| Vanguard Target Retirement 2050 Trust II | 11.60% |
| Vanguard Target Retirement 2055 Trust II | 11.60% |
| Vanguard Target Retirement 2060 Trust II | 11.62% |
| Vanguard Target Retirement 2065 Trust II | 11.61% |
| Auto-Owners Stable Value Fund | 3.23% |

46. As shown, the performance of every Vanguard target date collective investment trust outperformed the Auto-Owners Stable Value Fund over the relevant period. As target date series are designed to account for the full spectrum of participant demographics and risk tolerances, this illustrates that even the most conservative investors were harmed by Defendants' decision to maintain assets in the Auto-Owners Stable Value Fund.

47. This result was entirely foreseeable, both in relation to the Vanguard target date series and broader historical market trends. Shown below is the annualized performance of the Auto-Owners Stable Value Fund in comparison to each Vanguard target date vintage[14] from January 1, 2008, the date of the Plan's creation, through 2016.

---

[14] The Vanguard Target Retirement Trust I series is shown in place of the Trust II series as the Trust II share class does not have sufficient performance history to cover this period. The Trust I and Trust II series are identical but for the Trust I series' higher fees. Furthermore, the 2055, 2060, and 2065 vintages are omitted as they do not have performance data for this period regardless of share class.

15

| Investment | 2008-2016 Annualized Return |
|---|---|
| Vanguard Target Retirement Income Trust I | 4.59% |
| Vanguard Target Retirement 2020 Trust I | 4.81% |
| Vanguard Target Retirement 2025 Trust I | 4.82% |
| Vanguard Target Retirement 2030 Trust I | 4.80% |
| Vanguard Target Retirement 2035 Trust I | 4.94% |
| Vanguard Target Retirement 2040 Trust I | 5.13% |
| Vanguard Target Retirement 2045 Trust I | 5.11% |
| Vanguard Target Retirement 2050 Trust I | 5.18% |
| Auto-Owners Stable Value Fund | 4.31% |

48.     Again, it is shown that the Vanguard target date collective investment trust series outperforms the Auto-Owners Stable Value Fund across all vintages and corresponding risk tolerances. This is particularly informative when viewed from the 2008-2016 time period as this includes the devastating market performance stemming from the climax of the 2008 financial crisis. Despite the inclusion of performance data from the most severe worldwide economic crisis since the Great Depression, each Vanguard target date vintage outperformed the Auto-Owners Stable Value Fund over this period. Yet with this historical data available to Defendants, they have still opted to forego re-enrollment and maintain assets in the proprietary Auto-Owners Stable Value Fund.

49.     The inferiority of capital preservation options like the Auto-Owners Stable Value Fund compared to balanced portfolios is not limited to a comparison to the Vanguard target date series or the timeframes assessed. Reviewing historical market trends further confirms the inappropriateness of Defendants' decision to concentrate assets in low-yielding capital preservation options for the goal of retirement savings.

50.     Presented below is a chart depicting the growth of $1,000 from 1980 through 2013, the year immediately prior to the addition of the Vanguard target date series to the Plan, of: the

Bloomberg U.S. Aggregate Bond index, the S&P 500 index, a blended index of 40% S&P 500 and 60% Bloomberg U.S. Aggregate Bond index, a blended index of 60% S&P 500 and 40% Bloomberg U.S. Aggregate Bond index, and the federal funds rate. "The crediting rates of stable value funds [like the Auto-Owners Stable Value Fund] generally follow market interest rate trends[,]"[15] thus the federal funds rate is used as a proxy for historical performance of stable value funds. The two blended indices represent two balanced portfolio approaches common to retirement investments.



51.     As shown, historical market data makes clear that long-term investment in stable value products like the Auto-Owners Stable Value Fund cannot provide the adequate capital

---

[15] David Berget al., Stable Value Inv. Assoc., *Stable Value and Rising Interest Rates* 3 (Mar. 27, 2019),          *available*          *at*          https://www.stablevalue.org/wp-content/uploads/SVIA_Rising_Rates_2019.pdf (last visited Aug. 6, 2025).

appreciation necessary for sufficient retirement savings. Yet until 2014, Defendants made no investments other than the Auto-Owners Stable Value Fund available to participants. Even when additional investments were offered, Defendants opted to allow the bulk of the Plan's assets to remain in the Auto-Owners Stable Value Fund and have continued to do so in the years that have followed.

> **C.     The Concentration of Assets in the Auto-Owners Stable Value Fund Was Entirely Foreseeable**

52.     Defendants failed to act prudently or in participants' best interests by allowing the bulk of participants' assets to remain in the proprietary Auto-Owners Stable Value Fund rather than be invested in appropriate investments that align with participants' risk tolerances while allowing for adequate growth in retirement savings.

53.     "The most prudent . . . fiduciaries are not those who defensively opt for inaction, but instead are those fiduciaries who assess and understand what is in their participants' best interests *and* proactively take steps to further those interests."[16] This is due to the well-documented phenomenon of investor inertia, or the condition where investors are comfortable doing nothing.[17] For example, over 75% of participants remain in the default investment option after enrollment, highlighting the importance of properly directing participants' assets from inception.[18]

---

[16] Matthew J. Eickman, J.D., *Investment Refresh: Improving Participant Outcomes Through Re-enrollment*, Qualified Plan Advisors White Paper Series 1.

[17] Uma Shashikant, *What Is 'Investor Inertia' and How It Can Waste Your Wealth*, The Econ. Times, updated Sept. 11, 2018, *available at* https://economictimes.indiatimes.com/wealth/invest/what-is-investor-inertia-and-how-it-can-waste-your-wealth/articleshow/65729188.cms?from=mdr (last visited on Aug. 6, 2025).

[18] Brigitte C. Madrian & Dennis F. Shea, Working Paper No. 7682, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, Nat'l Bureau of Econ. Research Working Paper Series 3-4, 7, 18-20, 53 (May 2000), *available at* https://www.nber.org/system/files/working_papers/w7682/w7682.pdf (last visited Aug. 7, 2025).

54.     This is particularly harmful when the initial choice is a low-yielding capital preservation option like the proprietary Auto-Owners Stable Value Fund. Allowing participants to remain "ultra-conservative with their retirement savings . . . could curb their chances of living the good life in their golden years."[19]

55.     Furthermore, simply adding more diversified investment options, like the Plan's Vanguard target date series, is not enough. "Plans that just add [target date funds] as a new option in their lineups see an adoption rate of less than 5%, even a few years later."[20] In contrast, among plans that undergo re-enrollment, "73% allowed their assets to be moved to a [target date fund], and 99% of those whose funds were moved are satisfied."[21]

56.     Despite the clear evidence documenting investors' tendencies to improperly remain in investment options divorced from their specific retirement needs, Defendants did nothing to remedy this issue within the Plan. Instead, Defendants sat idle as Plan participants forewent years of valuable asset growth necessary for ensuring adequate retirement savings. Defendants prioritized their bottom line by ensuring assets remained within the proprietary Auto-Owners Stable Value Fund at the expense of participants' financial wellbeing.

## II.     PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

57.     Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of

---

[19] Brian O'Connell, *Today's Investors Are Too Conservative*, U.S. News & World Report, May 8, 2017, *available at* https://money.usnews.com/investing/articles/2017-05-08/investors-are-too-conservative-with-their-retirement-portfolios (last visited Aug. 7, 2025).

[20] JPMorgan, *Understanding Re-Enrollment* 1 (2021), *available at* https://am.jpmorgan.com/content/dam/jpm-am-aem/global/en/insights/retirement-insights/ri-reenroll-0719.pdf (last visited Aug. 7, 2025).

[21] JPMorgan, *Guiding Participants from Intent to Action: 2016 Defined Contribution Plan Participant Survey Findings* 6 (July 2016).

ERISA, until shortly before the suit was filed. Further, Plaintiff does not have actual knowledge of the details of Defendants' decision-making processes with respect to the Plan (including Defendants' specific processes for monitoring and evaluating Plan investments and asset allocation) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

58.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

59.     Plaintiff asserts his claims in Counts I-II on behalf of a class of participants and beneficiaries of the Plan (the "Class") defined as follows:[22]

> All participants and beneficiaries of Auto-Owners Insurance Company Retirement Savings Plan, at any time on or after August 19, 2019, excluding any persons with responsibility for the Plan's investment or administrative functions.

60.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 6,950 to 8,950 participants at all relevant times during the applicable period.

61.     Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff's assets were invested in the Auto-Owners Insurance Company Retirement Savings Plan and suffered financial harm as a result of Defendants' mismanagement

---

[22] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' investment decisions were in breach of their fiduciary duties and affected all of the Plan's participants similarly.

62.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and Plaintiff has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

63.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.   Whether Defendants are fiduciaries with respect to the Plan;

    b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c.   The proper form of equitable and injunctive relief; and

    d.   The proper measure of damages and other monetary relief.

64.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

65.    Class certification is also appropriate under Fed R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would

substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. § 1109 and 1132 would be similarly dispositive of the interests of other participants.

66.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## **COUNT I**
### **Breach of Fiduciary Duties**
### **29 U.S.C. §§ 1104(a)(1)(A)-(B), 1105(a)**

67.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

68.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with the administration of the Plan and monitoring of Plan investments.

69.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with appropriate care, skill, diligence, and prudence. Further, Defendants are directly responsible for selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

70.     As described throughout the Complaint, Defendants failed to prudently and objectively monitor the Plan to ensure that the assets of the Plan were invested in a prudent manner. Defendants prioritized maintaining a significant asset base within the proprietary Auto-Owners Stable Vale Fund to the detriment of participants and their retirement savings.

71.     Based on the conduct described above and throughout this Complaint, it is evident that Defendants did not manage the Plan based solely on what was in the interest of the Plan's participants. Instead, Defendants' conduct and decisions were influenced by their unwarranted preference for the proprietary Auto-Owners Stable Value Fund. Through their actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of its participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A).

72.     Further, each of the actions and omissions described in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C § 1104(a)(1)(B).

73.    As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses. Defendants are liable, under §§ 1109 and 1132, to make good to the Plan all such losses resulting from the aforementioned fiduciary breaches.

74.    Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

75.    The Committee and its members (as well as Auto-Owners Insurance Company) are fiduciaries of the Plan with responsibilities relating to the monitoring of the Plan's investment options.

76.    Auto-Owners Insurance Company is responsible for appointing and removing members of the Committee. Auto-Owners Insurance Company therefore has a fiduciary responsibility to monitor the performance of the Committee and its members.

77.    A monitoring fiduciary must ensure that its appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of the Plan's assets, and must take prompt and effective action to protect the Plan and participants when appointed fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

78.    Auto-Owners Insurance Company breached its fiduciary monitoring duties by, among other things:

a. Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

b. Failing to monitor the processes by which the Plan's assets were invested, which would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

c. Failing to remove Committee members whose performance was inadequate in that they maintained a significant portion of the Plan's assets in the proprietary Auto-Owners Stable Value Fund, all to the detriment of the Plan and participants' retirement savings.

79. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to investment performance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Reid Gritsavage, individually, as the representative of the Class described herein, and on behalf of the Plan, prays for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A declaration that Defendants breached their fiduciary duties under ERISA;

D. An order awarding money damages or otherwise compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E. An order enjoining Defendants from any further violations of ERISA;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

25

I.      An award of such other and further relief as the Court deems equitable and just.


Dated: August 19, 2025          **NICHOLS KASTER, PLLP**

<u>s/Paul J. Lukas</u>

Paul J. Lukas, MN Bar No. 022084X

4700 IDS Center

80 S 8th Street

Minneapolis, MN 55402

Telephone: 612-256-3200

Facsimile: 612-338-4878

lukas@nka.com

*Counsel for Plaintiff and the proposed Class*

26